FILED
01/13/2020
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE

July 24, 2019 Session

## STATE OF TENNESSEE v. JEFFREY WOOTEN

**Appeal from the Criminal Court for Knox County**
**No. 103924   Steven Wayne Sword, Judge**

_____

### No. E2018-01338-CCA-R3-CD

_____

The Defendant-Appellant, Jeffrey Wooten, was convicted as charged by a Knox County jury of three alternative counts of first degree felony murder; first degree premeditated murder; two counts of especially aggravated burglary; especially aggravated robbery; two counts of aggravated robbery; two counts of attempted especially aggravated kidnapping; two counts of carjacking; two counts of evading arrest; two counts of employment of a firearm during the commission of a dangerous felony; aggravated burglary; and automobile theft, for which he received an effective sentence of life imprisonment without parole plus forty-eight years to be served in the Tennessee Department of Correction. In this appeal as of right, the Defendant contends that the trial court erred in admitting portions of a 911 call; that there was insufficient evidence to support the Defendant's convictions; that the trial court erred in allowing evidence of an alleged offense in Georgia during the penalty phase; and that the trial court erred in imposing partial consecutive sentencing. Upon our review, we affirm the judgments of the trial court. However, we remand this case for entry of judgment forms for each count of the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Remanded for Entry of Judgments Reflecting Merger**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court. ROBERT L. HOLLOWAY, JR., J., filed a concurring opinion in which TIMOTHY L. EASTER, J., joined.

Mark E. Stephens, District Public Defender, and Jonathan Harwell, Assistant Public Defender, for the Defendant-Appellant, Jeffrey Wooten.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Kevin J. Allen, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Facts.** This case stems from two burglaries during which the homicide victim, Randy G. Lands, was shot and killed. Although the Defendant did not contest that he was "involved" in the victim's death, his defense theory at trial was that another, unknown individual was responsible for the crime. Prior to trial, the Defendant filed a motion in limine seeking to exclude portions of a 911 call from May 9, 2014, the day the victim was killed. As relevant to the motion, the facts showed that upon arriving home from the gym on the morning of the May 9th, Rebecca Garner, the victim's sister, and Loretta Lands, the victim's mother, observed a blue van in their driveway. The driver of the van, later identified as the Defendant, approached them and held a gun to Garner's head. He demanded her car keys, and, after a brief struggle, the Defendant took Lands' purse and phone and fled in Garner's SUV, a black Ford Edge. A neighbor called 911 and gave the phone to Garner, who then began to give the 911 operator details from the carjacking. While Garner was talking to the 911 operator, she entered her mother's home and discovered her brother's lifeless body. The 911 call captures Garner and Lands crying and emotionally upset. As grounds for exclusion, the Defendant argued that this portion of the 911 call was "highly prejudicial and inflammatory and the probative value was substantially outweighed by its prejudicial effect." In response, the State argued that the 911 call was "corroborative" testimony and was admissible as an excited utterance. After listening to the 911 call, the trial court denied the motion.

At trial, Michael Allen Mays, the manager of records for Knox County Emergency Communications, testified regarding two computer aided dispatch (CAD) reports from 911 calls made on May 7, 2014, and May 9, 2014. He explained that a CAD report is generated from the data input into their computer system by each 911 operator responding to a 911 call. The first CAD report showed that on May 7, 2014, at 5:36 p.m., Mike Wooten called 911 to report a burglary at 4027 Lonas Drive at 5:36 p.m. Wooten called back at 6:47 p.m. that same day to report that his parents' van had been stolen from their garage. Mays also conducted a historical search from the phone number called by Wooten, which showed an ambulance call to the same address on May 3, 2014, in response to "a 74-year-old male, possible stroke." The second CAD report showed that on May 9, 2014, 911 dispatch received a call that was coded as a "carjacking" at 7622 Hunters Ridge Way. Mays also testified that he compiled a compact disc containing the audio recordings of the 911 calls from these reports. After defense counsel renewed their previous objection, the disc was admitted into evidence as an exhibit and played for the jury at trial.

Michael Wooten testified that in May 2014, his parents, Don and Bobbie Jean Wooten, resided in his childhood home located at 4027 Lonas Drive, Knoxville, Tennessee. Around this time, Wooten's father had suffered several strokes, which caused

- 2 -

him to be hospitalized. Michael Wooten and his mother would alternate between staying at the hospital overnight and checking on the home. While he could not recall the exact day, he recalled that at some point in May 2014, he left the hospital to check on his parents' home and discovered that it had been burglarized. He observed that the television had been torn off the wall and that his parents' van had been stolen from the garage. He reported the offense to the police.

Bobbie Jean Wooten,[1] the Defendant's aunt, testified consistently with the testimony of her son, Michael Wooten. She also identified several photographs of items taken from the May 7 burglary including the flat screen television, her diamond ring, medicine bottles, and her husband's wallet. She further confirmed that the van that was taken from her garage had a specialized license plate which read, "Don and Bobbie." On cross-examination, she agreed that the Defendant had not been to her home "more than a dozen or so times in his entire life." She had difficulty remembering the last time the Defendant had been inside their home; but she recalled that it was when the Defendant had paid back money he had borrowed from her husband. She was aware that the Defendant previously had been in a serious car accident and agreed that he had "never been the same since that accident." Finally, Bobbie Jean Wooten agreed that her home had been burglarized previously by her granddaughter who pleaded guilty to that offense. She agreed that there were two sets of keys for the van: a set that her husband kept and a set that was kept underneath the floormat in the van. She was uncertain if the key recovered by the police was the key to the van.

Rebecca Kay Garner, the victim's sister, testified that her brother, age 44, suffered from epileptic seizures his entire life. Based on his condition, the victim had "the mental capacity of maybe a [10] to 12-year-old" child. She said her brother lived with her mother, needed help taking care of himself, and enjoyed his privacy. She also identified photographs of her brother from a family reunion a year before his death, which were admitted as a collective exhibit. Various photographs of her Hunters Ridge Way home, which she had purchased for her mother and brother, were also admitted into evidence and used throughout her testimony.

On May 9, 2014, Garner had come home for the weekend from out of town to visit her then 78-year-old mother for Mother's Day. That morning, Garner and her mother had gone to the gym, and upon returning home, they noticed a van parked in her mother's backyard. Garner testified that this was "unusual" because the van had to "go around" her mother's car to get in the driveway and that it was parked on the lawn. She said that the doors to the van were open and that a man was leaning partially into the van.

---

[1] We acknowledge that the indictment has a different spelling of this witness' name; however, we will spell her name here as recited during her testimony.

Because Garner's neighbor had been having some work done at his home, Garner parked her SUV in the driveway and did not think any more about the van.

Garner's mother exited the car first, and the man began talking to her. As Garner approached, she observed that the man had a gun in his hands. Garner testified that the man put the gun to her mother's back and pushed her mother back toward the car. The man then approached Garner, grabbed her arm, and put the gun to her head. The man said, "'Get in the car. I'm going to kill you. I'm going to shoot you. Get in the car.'" Garner resisted, refused to get in the car, and reasoned, "'If you're going to kill me, you're going to have to do it here.'" After a brief struggle, Garner managed to free herself and screamed for her mother to run. The man grabbed Lands' purse and phone, got into Garner's black SUV and drove away. The van remained parked in the Lands' driveway.

As the man was driving away, Garner ran toward a neighbor's house, screaming for her to call 911. While in her neighbor's driveway, Garner began talking to the 911 operator and Lands started walking back toward her home. Garner followed her mother and observed broken glass near the back-porch window. Garner remained on the phone with the 911 operators as she entered the home. Standing a few steps in the kitchen doorway, Garner immediately observed her brother's body, with blood "all around his head." She said the victim's body was laying face-down, with his feet toward the refrigerator. She knew her brother had passed away because his face was "blue looking." Garner was unable to go into the kitchen; however, her mother, in tears, knelt near the victim's body and held his head. Shortly thereafter, they exited the house and waited for the police to arrive. Approximately thirty minutes later, Garner's mother suffered a heart attack, was rushed to the hospital, and eventually had open heart surgery.

At trial, Garner identified the man she encountered in her mother's driveway on May 9, 2014, as the Defendant. Garner also identified various photographs of items that were taken during the May 9 offense, all of which were admitted as exhibits. The photographs included: Garner's car, Garner's watch, necklace and jewelry of her mother's, her mother's keys which had been inside her mother's purse on May 9, her mother's driver's license and the victim's social security card, her mother's cards that were inside of her wallet inside of her mother's purse, her mother's vacuum cleaner which was kept in the laundry room inside of her mother's home, and Garner's luggage. Garner's luggage was returned to her two days after the offense. A photograph showing the inside of her luggage revealed her Kindle, her mother's CD player, and a remote control for one of their televisions. Garner testified that on the day of the offense, she had left her Kindle and the remote on the bedroom nightstand in the master bedroom of her mother's home. She testified further that the CD was inside the same nightstand drawer.

- 4 -

Garner also identified the following other items including: medication belonging to her mother and her brother; a pillowcase from the victim's room; sandals; a flowery suitcase; gold box; the victim's camouflage wallet; a television remote; a U.S. bank box taken from her mother's room; checks with the victim's name; the victim's guitar taken from the living room; the victim's knife; her mother's silver taken from the dining room drawer; and the victim's laptop. Garner testified that she did not know the Defendant prior to the instant offenses. She knew of no reason for her brother's blood to have been found inside the van parked at her mother's house and there was no reason for the Defendant's blood to have been found inside her mother's home.

Loretta Lands, the victim's mother, testified consistently with the testimony of her daughter, Rebecca Garner. At trial, Lands also identified the man she encountered in the driveway on May 9, 2014, as the Defendant. She additionally said that before going to the gym on the morning of May 9, the victim was up and getting dressed. She told him they were going to the gym and would be back to go into town or do whatever they had planned for the day. Lands also identified items taken from her during the carjacking that were subsequently found in Garner's car, and she noted that Garner kept a "spotless" car, unlike its condition in the photograph. Lands also identified items taken from her home. She specifically identified a $400 check, made out to cash, which contained her name in the signature line; however, she did not sign it. Lands also said that the "reddish brown stains" found on the pillowcase were not there prior to the offense. On cross-examination, Lands testified that the victim would have dinner regularly with her neighbor, John Herrle. She denied that she, Garner, or the victim smoked cigarettes.

Barbara Linkes testified that she lived across the street from Lands and the victim and that Lands was one of her best friends. On the morning of the offense, Linkes observed a "green-bluish van" pull into Lands' driveway, which was unusual because "[the van] went right up past [Lands'] truck into [Lands'] backyard." She testified that thirty minutes later, she observed Garner running toward her and screaming for her to call 911, which she did. Linkes' grandson, Mark Linkes, also testified that he was outside in the yard when the van drove into Lands' driveway. Mark Linkes testified that the van pulled into the driveway approximately thirty to forty-five minutes before his grandmother called 911. After his grandmother called 911, Mark Linkes approached the van, which remained parked in Lands' driveway, and observed ropes and appliances inside. Another neighbor of the Lands, Jeffrey Lynn Perry, age 52, was pushing his bike up a hill on the day of the offense when he too observed Garner running down the street yelling for help.

John Herrle testified that the Defendant married his ex-wife in 2008. Sometime after his divorce, Herrle moved into the Lands' neighborhood. He continued to have

contact with the Defendant because the Defendant would help his ex-wife with the visitation arrangements for Herrle's children. Herrle also confirmed that he had asked the Defendant to do some yard work in November 2009 and January 2010. Herrle recalled that after the Defendant completed the January job, he observed the Defendant exiting the Lands' home with the victim and Herrle's handicapped nephew, Tim Doty. All three individuals came to Herrle's home and appeared to be getting along.

Vola Gail Clabough knew the Defendant through her sister and had not seen him for approximately two or three years prior to the instant offenses. Clabough testified that on May 8, 2014, the Defendant came to her home on Harris Road and that he was driving a van. Clabough had never seen the van, and the Defendant told her that he had purchased it. The Defendant stayed at Clabough's home for about an hour and left around 4:30 p.m. Clabough testified that the Defendant returned to her home the next day, May 9, 2014, driving a black, "newer car." The Defendant stayed at her home for approximately two and a half hours. Shortly after the Defendant left, the police arrived at Clabough's home in search of unusual activity in the area. The police showed Clabough photographs of the blue van and the black SUV, and Clabough identified them as the vehicles she observed the Defendant driving. Robert Rush, a neighbor of Clabough's, testified and confirmed that he was present at Clabough's home on May 9, 2014. As Rush was entering Clabough's home, Rush observed a man exiting the door. Rush said that the man almost fell back on the steps but simultaneously kept his hand in his pocket, which Rush opined was consistent with the man holding a knife or a gun. Rush said the man then took off around him and drove away in a black car.

Sergeant Jeff Jackson of the Knox County Sheriff's Department testified that he was the first officer to respond to the burglary call at the Lands' home on May 9, 2014. Upon arrival, he met with Garner and Lands, entered their home, and secured the area for the arrival of major crime detectives and forensic personnel. Sandi Campbell, a member of the Knox County Sheriff's Office crime scene unit, also responded to the Lands' home and video recorded various aspects of the crime scene. She created a compact disc of portions of the crime scene video which was admitted as an exhibit and narrated for the jury. She also assisted in processing for latent fingerprints and lifted several latent fingerprint cards from the entry door. She said these cards were forwarded to Tom Finch for further examination. Officer Campbell also responded to Cedar Bluff Towing, where the van that had been in the Lands' driveway was stored and inventoried for evidence. On cross-examination, she confirmed that the video captured two cigarette butts in the driveway; however, she did not collect them.

Nathan Stansberry of the Knox County Sheriff's Office responded to the Lands' home and took photographs, processed the van parked in the driveway for latent fingerprints, and collected deoxyribonucleic acid (DNA) or used DNA swabs. A

collective exhibit of various photographs and digital images that were taken from the scene was admitted into evidence. He also noted that a .380 caliber shell casing was collected from the scene, which was admitted as an exhibit at trial. Officer Stansberry collected (1) the envelope containing the victim's fingernail clippings from the medical examiner, (2) the projectile recovered from the victim's head from the medical examiner, (3) a DNA card from the medical examiner, and (4) buccal swabs from the Defendant. These items were forwarded to the Tennessee Bureau of Investigation (TBI) for further examination and analysis.

Sergeant Mackenzie Alleman of the Knox County Sheriff's Office responded to the Lands' home and testified consistently with prior crime scene officers. She added that there was visible reddish-brown staining in different areas on the van, all of which were swabbed and collected for later analysis. She further explained that there were approximately 100 items that were collected and processed from the van. For ease of reference, she compiled a spreadsheet showing the item, the officer who collected it, where it was found, and the date and time it was collected. She noted that the spreadsheet erroneously listed the location of a bag of evidence in the emergency room rather than the forensic center where the autopsies are performed. The spreadsheet also noted that a different officer collected the evidence, which Sergeant Alleman corrected at trial. She processed two latent print cards from inside the home, which were not usable. She confirmed that a matching pillowcase from inside the Lands' home was later found inside of the van. She compiled a compact disc of photographs taken from processing the van for evidence, which was admitted as an exhibit and displayed in detail to the jury.

There were over 200 photographs taken of the van and its contents. Sergeant Alleman showed the photographs to Lands and Garner, who identified multiple items that belonged to them. The photographs also showed where the items were located in the van and included items taken from the Lands' home such as a full-size vacuum cleaner, lots of jewelry boxes, medication bottles, tools, luggage, table clothes, two televisions, a tablet, a portable CD player, two remotes inside the luggage, a large rope, a pillowcase full of medication, a wallet, a set of keys, a guitar, and women's sandals. Sergeant Alleman further confirmed that .380 caliber ammunition and various items of paperwork bearing the Defendant's name were recovered from the van.

Sergeant Alleman requested ten items to be forwarded to and examined by the TBI including: a cardboard box from atop the dryer with a reddish-brown stain on it recovered from the Lands' home; a full Coca-Cola can and a Fender hat found near the victim's foot in the kitchen in the Lands' home; two swabs of reddish-brown stains from the passenger side front handle of the van, two swabs of reddish-brown stains from the van handle rear back door; two swabs from the front edge of television taken from the victim's room [recovered from the van]; miscellaneous papers and gloves recovered from the van; a

.380 caliber spent casing removed from the floor of the van; a .380 caliber live round; and two swabs from the front dash of the interior of the van, all of which were admitted as exhibits at trial. Finally, Sergeant Alleman assisted in obtaining postmortem fingerprinting of the victim for later comparison and analysis.

On cross-examination, Sergeant Alleman agreed that Randy Turner had reported that he had received a box from the Defendant, admitted as an exhibit, which Sergeant Alleman had processed for evidence. A bus ticket issued in the name of "Tom Roberts" was inside the box, which showed that it was purchased on May 6, 2014, at 10:59 p.m. The bus was scheduled to depart Nashville on May 7 at 1:30 a.m. and arrive in Knoxville on May 7 at 5:30 a.m. She agreed that a Dodge Ram key was located inside a pillowcase inside of the van. Although she recovered three cigarettes, two Pall Malls and a Camel, from nearby Lands' car, they were not forward to the TBI for testing. She agreed that no cigarettes were found inside the Lands' home or inside the van. She further acknowledged the presence of two Mountain Dew cans in photographs from the van, which were not collected or processed for fingerprints.

Captain Miles Park of the Knox County Sheriff's Office, an expert in fingerprint identification, testified that he analyzed one latent fingerprint card recovered from the television taken from the victim's room and two from the van. Based on his expert opinion, each of the latent prints that were recovered matched the fingerprints of the Defendant. Officer Tom Finch, an expert in fingerprint analysis employed with the Knox County Sheriff's Department, testified and confirmed that three prints lifted from the van and a single print from the Coca-Cola can recovered near the victim's foot matched the fingerprints of the Defendant.

Deputy Bobby Hamilton of the Loudon County Sheriff's Office testified that he received information from other agencies concerning a possible stolen vehicle driven by a homicide suspect. He said the vehicle was being tracked by an OnStar vehicle apparatus, which narrowed its location to the I-40 interstate. In proceeding to the location, Deputy Hamilton recorded the ensuing, 12-minute car chase on the in-car camera of his patrol car, which was admitted into evidence and played for the jury. Deputy Hamilton testified that he reached speeds exceeding 116 miles per hour during the pursuit, that there was traffic and potential danger to the public, and that the chase ended after a lead officer, Deputy Upton, executed a "PIT" maneuver resulting in the Defendant wrecking the car. Finally, Deputy Hamilton was forced to use his taser on the Defendant because he refused to comply with the officers' commands upon arrest.

Michael Maclean, a supervisor of the Major Crimes Division of the Knox County Sheriff's Office, testified that he was involved in the apprehension of the Defendant. Based on telephone information, he was advised that the Defendant was traveling

westbound on I-40. Maclean testified that the Defendant eventually passed him driving a black Ford Edge with other police units in pursuit. The Defendant was apprehended at Lovell Road, where he was "extracted" from the car by several officers including David Amburn and Jeremy McCord. Maclean observed Officer Amburn conduct a pat down search of the Defendant, during which he retrieved Lands' driver's license, a social security card, and a $400 check. Photographs of the location of the Defendant's arrest were identified, admitted into evidence, and displayed to the jury. Rachel Sandlin of the Knox County Sheriff's Office crime scene unit testified that she responded to University of Tennessee Hospital Emergency Room as well as Cedar Bluff Towing, where the van was stored. At the hospital, she photographed the Defendant, reflecting the injuries to his hands, and his clothing, a DVD of which was admitted into evidence and displayed to the jury.

Officer Kimberly Trotter of the Knox County Sheriff's Office crime scene unit testified that she responded to the location where Garner's SUV was recovered on Lovell Road. Upon her arrival, she was given items recovered from the Defendant's right pocket; specifically, a $400 check, a social security card, and Lands' driver's license; all of which were admitted into evidence. She said Garner's SUV was towed from Lovell Road to Cedar Bluff Towing to be processed for evidence. Officer Trotter took 126 photographs of items of evidentiary value between Lovell Road and Cedar Bluff Towing, which were admitted into evidence and displayed to the jury during trial. The parties entered a stipulation to the chain of custody concerning a pill bottle containing purported narcotics recovered from the ground near Garner's car. The State also admitted into evidence a recording of a phone call the Defendant made from jail after he was taken into custody. On the call, the Defendant said he made "basically kind of a bad choice" and that he was "looking at life in prison."

Several agents of the TBI testified concerning their examination of evidence including Special Agent Alex Brodhag, an expert in the field of firearms examination, who compiled a report analyzing the ammunition that was recovered, Special Agent Molly Stanfield, an expert in forensic chemistry, who prepared a report confirming that the substances found in the pill bottles recovered from the Defendant were marijuana and methamphetamine, and Special Agent Laura Boos, an expert in the area of forensic biology, who generated a report reflecting her examination of the swabs from the van, the television from the victim's room, the swabs taken from the cardboard box from the Lands' home, and the pillowcase, all of which were positive for the presence of the Defendant's blood and DNA. Significantly, the gloves recovered from the van contained a mixture of the Defendant's and the victim's blood and DNA.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Anderson and Knox County, testified that she supervised the forensic pathologist who performed the

autopsy on the victim in this case. She explained that the victim's cause of death was a gunshot wound to the head and the manner of death was homicide. After the State rested its case-in-chief, a "Client Stay History Report" showing that the Defendant was at the Nashville Rescue Mission on May 4, 2014, was entered into evidence by stipulation of the parties.

Following the submission of the above proof, the jury convicted the Defendant as charged. At the penalty phase of the trial, the State offered evidence in support of three aggravating circumstances, which were applied by the jury to impose a sentence of life without parole. After a sentencing hearing, the trial court determined that the Defendant was a dangerous offender based on his persistent history of violent crime and that it was necessary to protect society from future crimes by the Defendant. As reflected in the below chart, the trial court imposed a 48-year term of imprisonment to be served consecutively to the Defendant's sentence of life imprisonment without parole.

| COUNT | OFFENSE | VICTIM | SENTENCE |
|---|---|---|---|
| 1 | First degree felony murder during the perpetration of a burglary | Randy G. Lands | Life without parole/merged into count 4 |
| 2 | First degree felony murder during the perpetration of a theft | Randy G. Lands | Life without parole/merged into count 4 |
| 3 | First degree felony murder during the perpetration of a robbery | Randy G. Lands | Life without parole/merged with count 4 |
| 4 | First degree premeditated murder | Randy G. Lands | Life without parole |
| 5 | Especially Aggravated Burglary/Vacated and reduced to Aggravated Burglary | Randy G. Lands | 10 years (concurrently with count 4/merged with count 6) |
| 6 | Especially Aggravated Burglary | Loretta Lands | [no judgment reflecting merger] |
| 7 | Especially Aggravated Robbery | Randy G. Lands | 40 years concurrently to count 4 |
| 8 | Aggravated Robbery | Loretta Lands | 20 years consecutively to count 4 |
| 9 | Aggravated Robbery | Rebecca Garner | 20 years consecutively to count 8 |
| 10 | Att. Especially Aggravated Kidnapping | Loretta Lands | 20 years concurrent to count 8 |
| 11 | Att. Especially Aggravated Kidnapping | Rebecca Garner | 20 years concurrently to count 9 |
| 12 | Carjacking by Intimidation | Rebecca Garner | 20 years concurrently to count 8; count 13 merged into count 12 |

- 10 -

| 13 | Carjacking with a deadly weapon | Rebecca Garner | [no judgment reflecting merger] |
|---|---|---|---|
| 14 | Evading Arrest | Officer Bobby Hamilton | 8 years consecutively to count 9; count 15 merged into count 14 |
| 15 | Evading Arrest | Officer David Amburn | [no judgment reflecting merger] |
| 16 | Employing a firearm during the commission of a dangerous felony to wit: especially aggravated burglary after having been previously convicted of a felony offense | | 10 years consecutively to count 5 |
| 17 | Employing a firearm during the commission of a dangerous felony to wit: carjacking after having been previously convicted of a felony offense | | 10 years consecutively to count 12 |
| 18 | Aggravated Burglary | Bobbi J. Wooten | 10 years concurrently to count 4 |
| 19 | Theft of Property over $1000 but under $10,000 (automobile) | Bobbi J. Wooten | 8 years concurrently to count 4 |

Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal. This case is now properly before this court for review.

## ANALYSIS

**I. Admissibility of 911 Call.** The Defendant contends that the trial court erred in admitting "the entirety of the 9-1-1 call, including the highly inflammatory portion during which [Garner and Lands] discovered the dead body of Randy Lands." He argues that there was no justification for admitting the challenged portion of the call to the jury as it served no evidentiary purpose, violated Rule 403, and its prejudicial effect greatly outweighed its minimal probative value. Citing State v. James D. Beaird, No. M2006-01931-CCA-R3-CD, 2008 WL 425923, at *10 (Tenn. Crim. App. Feb. 15, 2008), he maintains that the call contained "emotional outpourings of the victim's mother in the aftermath of a violent crime," violated his due process right to a fair trial, and was prejudicial because (1) the evidence was not overwhelming as to the charge of murder; and (2) the particular emphasis given the 911 call by the State.

In response, the State contends the trial court acted within its discretion in admitting the 911 call. The State argues that the Defendant "overstates the emotional content of the recording" and that "'[e]vidence which only appeals to sympathies, conveys a sense of horror, or engenders an instinct to punish should be excluded.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998). It argues further that the trial court properly determined that the call contained highly probative information concerning

the crime including a description of the Defendant, a description of the crime scene, a narrative of Garner's encounter with the Defendant, and information about Garner's stolen car. The State distinguishes James D. Beaird, a case in which the 911 call was only "marginally probative of the defendant's identity," and argues that the evidence in this case was not limited to a brief, vague description of the suspect. Even if the trial court abused its discretion in admitting the 911 call, the State argues any error would be harmless because the evidence of the Defendant's guilt presented at trial was "overwhelming." Upon our review, we agree with the State and conclude that the admission of the relevant portion of the 911 call, while error, did not undermine the fundamental fairness of the Defendant's trial.

Resolution of this issue is governed by the following well established rules of law and authority. The admissibility of evidence rests within the trial court's sound discretion, and this court will not overturn a trial court's decision regarding the admissibility of the evidence absent an abuse of that discretion. State v. Clayton, 535 S.W.3d 829, 859 (Tenn. 2017). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" State v. Lewis, 235 S.W.3d 136, 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted).

In denying the motion in limine to exclude the 911 call, the trial court reasoned, in relevant part, as follows:

> I think the defense['s] real concern in this call is at some point [Garner] and her mother go into the house and discover [the victim lying] on the ground and you hear [Garner] say, "My brother is on the floor and

he's been shot." And obviously it's a very emotional audio. You can hear just very reasonable and understandable crying and exclamations during the course of the phone call.

And then the 9-1-1 operator is seeking to get some information in response to the emergency situation: Is he breathing? And there's a response: No, he's not breathing. And that goes on a couple of minutes.

And then they asked some questions about, you know, "Can you tell where he's shot? How old is he?" Then she explains, "My mom and [I] just got back and saw there was glass all over the place. The door's busted out in the back."

And then she is answering questions from the 9-1-1 operator concerning the physical condition of [the victim] and also what – any description they could find of the alleged perpetrator and the man she said put a gun to her head and then took off running.

And so I do find that all of that is an excited utterance and was relating to that startling event, and that it was said during the course of …that startling event and her 9-1-1 call. She was in that emotional state at the time.

The question that I have and the question that I think [defense counsel] is focused on is really under 403 more than the hearsay rules and whether or not that that emotional outburst – as understandable as it is – is that so overly emotional that it would unfairly prejudice the Defendant. And the standard under 403 is, is whatever probative value it has, if it's substantially outweighed by the danger of unfair prejudice, then that evidence must be excluded.

After reviewing that call and considering the little bit I know about this case based upon the motions that have been filed in this case, the Court finds that although that is very emotional conduct, I don't think it is so unfairly prejudicial to the Defendant that it substantially outweighs the danger of unfair prejudice. I think that [Garner's] reaction that is captured on the phone, as well as her mother which is – can be heard in the background somewhat, any reasonable juror would understand that a mother and sister would be in that state of emotional shock at the time.

I think it is surrounded by a lot of probative value based upon [the victim's] condition as well as description of the … possible suspect in this case. And so even though there's this period of time where, you know, it's just crying . . . that part is fairly short. Throughout a lot of crying there's very probative information that … is being elicited here, and I don't think that redaction would . . . remove that crying state, the emotional state that's being reflected during the phone call.

After the 911 call was played and out of the jury's presence, the trial court noted as follows:

I want to put something on the record here. I was paying attention when we played the 9-1-1 calls, just as concerned about the issue that the defense had raised in Ms. Garner's phone call to 9-1-1, is that very emotional part where you can tell that [the victim's] body is discovered. So I – while that was playing, I was paying attention to the Jury and wanted to put on the record their demeanor.

When we got to that particular part of the call, everyone on the Jury was very stoic. I didn't see any expressions of emotion at all from any of them. I could tell from their body language.

Juror #10, [Name], shortly after that part – not during that part but shortly after – it …she was blinking – blinking frequently. I couldn't see any tears, but seemed like she was blinking faster than she normally had.

Juror #12, [Name], got a Kleenex out, I saw toward the end of it, and wiped her nose couple of times.

Also note that I continued to observe her throughout the morning and she has been bringing that Kleenex out and wiping her nose on occasion during… non-emotional testimony, so I suspect maybe she's got a bit of a runny nose.

And then lastly, Juror #3, [Name], at the very conclusion of the . . . call, somewhere around 13 minutes or so, he reaches up with his finger and wipes under his left eye. I couldn't tell if he was scratching. I didn't see any tears on anybody . . .

- 14 -

We have reviewed the 911 call in this case, which was 13 minutes and 59 seconds in length. The first 3 minutes concern routine details of the carjacking.[2] At 3 minutes and 32 seconds into the call, Garner, with her mother crying in the background, can be heard repeatedly screaming and crying, "Oh my God . . . Randy is laying on the floor! He's dead!" This continues on the recording for approximately 45 seconds or until the 911 operator gains Garner's attention and asks, "What's wrong?" Garner explains, exasperatedly, "I think my brother's been shot inside the house! I think he's dead!" The 911 operator repeats this information and begins to ask Garner questions about the condition of her brother. The 911 operator asks, "Is he breathing?" As she continues to cry, Garner replies, "I'm sorry . . . no." At 5 minutes 8 seconds into the call, Garner is still crying and asks the 911 operator to hurry and get someone to her home. For the next 20 seconds, Garner is heard crying and speaks indiscernibly. The 911 operator begins to ask Garner questions about the victim, "How old is your brother?" Garner can be heard, more collected, attempting to respond, saying he was 40. While continuing to cry, Garner told the 911 operator that she and her mother had just returned from the gym and found the broken glass at the back door. For the remainder of the call, Garner answers the 911 operator's questions about the carjacking while at the same time crying.

At the top of our analysis, we observe that the State argued to the trial court that the 911 tape would be "corroborative" of other testimony at trial, which, albeit correct, is an improper ground for its admission. Here, Garner and Lands testified extensively regarding the circumstances of the carjacking and the condition of their home after the burglary and upon finding the victim's body, which significantly lessened the probative value of the 911 call. Additionally, there was no genuine dispute at trial that these offenses, in fact, occurred, and the Defendant seemingly conceded his involvement. Although the Defendant blamed the victim's death on another, unknown individual, the only contested issue was the level of the Defendant's culpability. Under these circumstances, the probative value of this 911 call was far outweighed by the danger of unfair prejudice and needless presentation of cumulative evidence. Accordingly, the trial court erred in admitting the 911 tape.

However, we conclude the error was harmless given the overwhelming proof of the Defendant's guilt. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); State v. Cannon, 254 S.W.3d 287, 298-99 (Tenn. 2008) ("We apply a harmless error analysis to 'virtually all evidentiary errors.'"). In this case, after burglarizing the Lands' home, the Defendant committed a carjacking and attempted kidnapping of Garner and an aggravated robbery of Lands. Based on a vehicle location device, officers located the Defendant, and he engaged them in a high-speed chase which ended in a crash. Upon the

---

[2] We do not have a transcript of the 911 call in the record. Accordingly, our recount of Garner's dialogue with the 911 operator is not precise.

- 15 -

Defendant's arrest, officers conducted a pat-down search and recovered various items stolen from the Lands' home from inside the Defendant's right pocket; namely, a $400 check, a social security card, and Lands' driver's license. The Defendant's fingerprint was found on a Coca-Cola can recovered from the Lands' home, near the victim's foot. Additionally, the Defendant's blood and DNA were found on swabs taken from the cardboard box inside the Lands' home and the television from the victim's room. Significantly, the gloves recovered from the van contained a mixture of the Defendant's and the victim's blood and DNA. Although the 911 tape was indeed prejudicial, it was not so inflammatory that it would cause a jury to disregard the trial court's instructions and find the Defendant guilty based on an improper basis. Because there was overwhelming evidence of the Defendant's guilt, the error was harmless and the Defendant is not entitled to relief on this issue.

**II. Sufficiency of the Evidence.** After recognizing the applicable law governing claims challenging the sufficiency of the evidence, the Defendant concedes that there was "undoubtedly evidence consistent with [his] involvement in the charged offenses." Without challenging any of his 19 convictions, or the elements thereof, he then argues, rather generally in a single sentence, that there were "unexplained pieces of evidence that were consistent with a different narrative," which the State failed to prove. In response, the State contends, and we agree, that the evidence was sufficient to support the Defendant's convictions as charged.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon

direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

We take the unusual step of not reciting the elements of each of the Defendant's 19 convictions because it is unclear based on the Defendant's brief which convictions are challenged on appeal. Nevertheless, we have engaged in an exhaustive review of the record in this case, which contained 23 witnesses, countless photographs, DVDs, audio recordings, and an array of forensic evidence. The Defendant's guilt as to each count of conviction was overwhelming. The record shows that on May 7, 2014, Michael Wooten called 911 to report that his parents' home had been burglarized. During that burglary, a television had been torn from the wall and a van had been stolen from the garage. The next day, May 8, 2014, the Defendant went to Clabough's home on Harris Road, and she observed that he was driving a van. Clabough had never seen the van before, and the Defendant told her that he had purchased it. The Defendant stayed at Clabough's home for about an hour and left around 4:30 p.m. Upon returning home from the gym the next morning, on May 9, 2014, Garner and Lands observed the same van in their driveway. When they got out of their car, the Defendant approached them, put a gun to Garner's head, and demanded that she get in the car. When Garner refused, a brief struggle ensued, and Garner was able to escape. The Defendant grabbed Lands' purse and phone and drove away in Garner's black Ford Edge. With the assistance of their neighbors, Garner and Lands called 911 to report the carjacking. Shortly thereafter, upon entering their home, they discovered the burglary and the lifeless body of the victim.

That same day, the Defendant returned to Clabough's home driving a black, "newer car" and not the van from the day before. The Defendant left Clabough's home somewhat abruptly, and the police responded to Clabough's home a short time after he left. Based on a vehicle location device, the Defendant's location was narrowed down to the interstate, and a 12-minute car chase ensued. After wrecking the car, later determined to belong to Garner, the Defendant was apprehended. An officer conducted a pat-down search of the Defendant upon his arrest and recovered items taken from the Lands' home

burglary and carjacking in the Defendant's right front pocket. A later inventory of the van also revealed several items taken from the Lands' home. The Defendant's fingerprint was found on a Coca-Cola can recovered from the Lands' home, near the victim's foot, and his blood and DNA were found on swabs taken from the cardboard box inside the Lands' home and the television from the victim's room. Significantly, gloves that were recovered from the van contained a mixture of the Defendant's and the victim's blood and DNA.

We acknowledge that there were different brands of cigarettes in different locations at the Lands' home which were not tested for fingerprints or DNA. We further acknowledge the Mountain Dew cans found in the van which were not subjected to forensic analysis. Based on this evidence, the defense theorized at trial that another, unknown individual was the person responsible for the death of the victim. However, the jury heard and rejected the defense theory, as was its prerogative. Additionally, even if another, unknown individual killed the victim as suggested by the Defendant, the Defendant would be guilty under a theory of criminal responsibility, as charged to the jury. Because a rational jury could have found the Defendant guilty of the offenses as charged in this case, the Defendant is not entitled to relief.

**III. <u>Adequacy of Life Without Possibility of Parole Sentence.</u>** Next, the Defendant contends that the trial court erred in admitting evidence of an alleged offense in Georgia [hereinafter the Waffle House robbery] in support of aggravating circumstance-(i)(7), during the penalty phase of trial. Aggravating circumstance (i)(7) applies when a jury finds that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping[. . .]" Tenn. Code Ann. § 39-13-204(i)(7). Relying on <u>State v. Terry</u>, 813 S.W.2d 420, 423 (Tenn. 1991), the Defendant maintains that the trial court misconstrued aggravating circumstance (i)(7), because there was no nexus or temporal proximity between the flight from the Waffle House robbery and the murder of the victim in this case, which occurred eight days later. The Defendant argues that this evidence was inadmissible at the penalty phase and that it was prejudicial. He also argues that his sentence was arbitrary and improper based in part on the improper admission of aggravating circumstance (i)(7), specifically in light of the evidence of the Defendant's compelling life history and traumatic brain injury.

In response, the State contends that the trial court properly admitted the Waffle House robbery and that the jury acted within its discretion in finding aggravating circumstance (i)(7). The State points out that the relevant section of (i)(7) that was

applied in Terry concerned whether the murder was committed in the course of, during, or while engaged in the commission of another, enumerated felony, also known as the felony-murder section of (i)(7). In contrast, the section of (i)(7) at issue in this case was whether the defendant "was fleeing after having a substantial role in committing or attempting to commit, any [ . . . robbery, burglary, theft, or kidnapping.]" Based on the State's argument, "active flight" from any felony is the only proof necessary to establish this section of aggravating circumstance (i)(7). Accordingly, the State submits that the Defendant's reliance on Terry is misplaced. Finally, the State argues that even if the trial court erred in admitting the Waffle House robbery in support of aggravating circumstance (i)(7), the jury acted within its discretion in imposing a sentence of life without parole based on the existence of the remaining two aggravating circumstances. For reasons that follow, we conclude that it was harmless error to admit the Waffle House robbery.

Prior to the guilt phase of the Defendant's trial, the State submitted three aggravating circumstances in support of life imprisonment without parole, (i)(2), that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (i)(6), that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (i)(7), that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping. See Tenn. Code Ann. § 39-13-204 (2), (6), (7). In support of aggravating circumstance (i)(6), the State sought the admission of a robbery of a Waffle House in Georgia, alleged to have been committed by the Defendant on May 1, 2014. The State averred that the Defendant entered the Waffle House armed with a pitchfork and attempted to steal the cash register. He fell during the robbery and was confronted by employees, who chased him away. The Waffle House robbery was captured on video recording and posted to social media. Defense counsel argued in response that the admission of the Waffle House robbery was prejudicial because there was no evidence establishing that the murder of the victim in this case was committed because of the Waffle House robbery. The trial court agreed with defense counsel and initially precluded the Waffle House robbery under (i)(6) because there was not "sufficient proof to bring [the Waffle House robbery] in under [(i)(6)], that it was committed to avoid or prevent a lawful arrest."

After the State's first witness, the State asked the trial court to revisit its ruling concerning the admissibility of the Waffle House robbery under aggravating circumstance (i)(7). The State then argued that "the stronger argument" was under (i)(7) because the facts showed that the Defendant was "fleeing from a robbery that occurred in Georgia." The State reasoned that "they've got him in Georgia, May 1st … the fact that

- 19 -

he's in Nashville on May 4, the fact that he uses a false name to come to Knoxville and immediately starts committing crimes here shows … he was … in flight from those charges in Georgia." Defense counsel again reiterated that the connection between the two crimes was "too remote." Defense counsel argued further that there was no evidence showing the Defendant was in the act of fleeing from Georgia because he used his real name and had his picture taken when he checked into the Rescue Mission in Nashville. In construing (i)(7), the trial court determined that the Defendant was "actively fleeing" from Georgia; therefore, it allowed the State to introduce evidence of the Waffle House robbery. Before submitting the statutory aggravating and mitigating factors to the jury, the trial court stated, in relevant part, that the State had provided proof in support of (i)(7); specifically, "through the [Waffle House robbery] as well as through the burglary of the home and theft from the home of Randy Lands and Loretta Lands."

Upon our review of a defendant's challenge to a sentence of life imprisonment without the possibility of parole, this court will first consider any errors assigned and then review the appropriateness of the sentence. Tenn. Code Ann. § 39-13-207(g). A sentence of imprisonment for life without parole is appropriate "if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." Id. We review the sufficiency of the evidence for an aggravating circumstance in the light most favorable to the State and determine whether a rational trier of fact could have found beyond a reasonable doubt that the evidence established at least one of these aggravating circumstances and that such aggravating circumstance or circumstances outweigh any mitigating circumstances. State v. Henretta, 325 S.W.3d 112, 144-45 (Tenn. 2010) (citing State v. Kiser, 284 S.W.3d 227, 272-73 (Tenn. 2009)). When a sentence is based in part upon one or more invalid aggravating circumstances, but at least one valid aggravating circumstance remains, the jury's reliance upon the invalid aggravating circumstance is not reversible error . . . unless the defendant demonstrates that the jury grossly abused its discretion by arbitrarily imposing the sentence. State v. Harris, 989 S.W.2d 307, 317 (Tenn. 1999).

After the jury convicted the Defendant of first degree murder, it then had to determine based upon the applicable statutory aggravating and mitigating circumstances whether to sentence him to life or life without the possibility of parole. Tenn. Code Ann. § 39-13-202(c), -207(a). In this case, the State relied upon three aggravating circumstances: (1) that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to

commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping[. . .]" See Tenn. Code Ann. § 39-13-204 (2), (6), (7). In support of (i)(2), the State admitted three certified convictions showing that the Defendant had been previously convicted of aggravated robbery by use of a deadly weapon. In support of (i)(6), the State submitted proof that the victim knew the Defendant prior to the burglary and that, when the victim interrupted the Defendant during the burglary, the Defendant killed the victim to a prevent him from identifying him in the future. In support of (i)(7), the State submitted proof establishing that the Defendant had committed a robbery in Georgia and was fleeing from that crime. In addition, the State established that the Defendant committed the carjacking, attempted kidnapping, and robbery of Loretta Lands in order to avoid prosecution of the victim's murder.

The Defendant did not rely upon any statutory mitigating factors. He offered a list of nonstatutory mitigating factors which included, in pertinent part, that he was highly intoxicated at the time of the offense, that the crime was committed under a substance induced mental disorder or brain injury, and that the Defendant grew up in a physically and emotionally abusive family. In support of these factors, Dr. Daniel Spica testified that he evaluated the Defendant's medical records and observed that he had experienced a prolonged loss of consciousness and had some skull fractures as a result of a severe car accident from 2005. Dr. Spica concluded that the Defendant had a neurocognitive disorder and suffered anxiety and depression. The Defendant's half-sister testified that the Defendant was adopted, had problems with his step-father, and was noticeably different after the 2005 car wreck. She agreed that the car wreck was caused by the Defendant crossing the median and colliding head-on with an 18-wheeler truck. She confirmed that, as a result, the Defendant was charged with DUI and cocaine possession. The Defendant's aunt also testified regarding the Defendant's childhood and his condition after the 2005 car wreck. Finally, a minister with the prison testified that the Defendant was involved in bible study.

Upon our review of the assigned error by the Defendant, we observe that in State v. Terry, 813 S.W.2d 420, 423 (Tenn. 1991), the defendant, a church pastor, embezzled substantial sums of money from his congregation over a period of time beginning in March of 1987. In June of 1987, the defendant killed the church handyman as part of his plan to assume his identity, placed the body inside the church building, and torched the building. The defendant's effort at foul play failed, and he was eventually convicted of first degree murder. At the sentencing hearing, the jury found aggravating circumstance (i)(7) based on the underlying larceny. The trial court granted the defendant's motion for a new trial, finding that the State had failed to prove that the murder was committed while the defendant was engaged in the perpetration of larceny. Id. at 422. The Tennessee Supreme Court agreed with the trial court and concluded that there was an

insufficient nexus between the murder and the larceny. In so holding, our supreme court addressed the quantum of evidence necessary to support a finding of aggravating circumstance (i)(7) and noted as follows:

> Whether the evidence supports a finding that the murder was committed in the course of, during, or while engaged in the commission of another felony ... generally depends on an analysis of the temporal, spatial and motivational relationships between the capital homicide and the collateral felony, as well as on the nature of the felony and the identity of its victim.

Terry, 813 S.W.2d at 423 (quoting 67 A.L.R. 4th 887, 892 (1989)) (citing State v. Hall, 958 S.W.2d 679, 693 (Tenn. 1997)). Moreover, "[t]he homicide must have a close connection with the felony and not be separate, distinct, and independent from it." See State v. Morris, No. 02C01-9801-CCA-00012, 1999 WL 51562, at *22 (Tenn. Crim. App. Feb. 5, 1999), aff'd, 24 S.W.3d 788 (Tenn. 2000) (internal citations omitted). The proof is sufficient to establish aggravating circumstance (i)(7) if the State proves both the elements of the murder and the elements of the accompanying felony *and that they were both part of the same criminal episode*. Id. (citations omitted) (emphasis added).

Applying this standard to the circumstances of the present case, we conclude that it was error to admit the evidence concerning the Waffle House robbery. There was simply no connection between the Waffle House robbery in Georgia and the murder of the victim in this case, which occurred in Tennessee eight days later. Although the State argues that the Defendant's burglaries and killing of the victim facilitated his flight from the Waffle House robbery, this ignores the holding in Terry, which requires the homicide and the collateral felony to be part of the same criminal episode. The Defendant may have fled from the Waffle House robbery; however, that crime was separate, distinct, and independent from the burglary, robbery, and murder of the victim in this case.

We further conclude, however, that the erroneous admission of the Waffle House robbery was harmless. As noted above, in addition to the (i)(7) aggravating circumstance, the State relied upon aggravating circumstances (i)(2) and (i)(6). The record shows that the State proved beyond a reasonable doubt that the Defendant had been previously convicted of three felonies whose statutory elements involve the use of violence and that the Defendant killed the victim in order to avoid, interfere with, or prevent his prosecution for the Lands' home burglary. Because the State established two valid aggravating circumstances, the jury's reliance upon the invalid (i)(7) aggravating circumstance is not reversible error. The Defendant has failed to demonstrate that the jury grossly abused its discretion by arbitrarily imposing the sentence of life without the possibility of parole. He is not entitled to relief.

**IV. <u>Consecutive Sentencing</u>**. The Defendant contends that the trial court erred in imposing partial consecutive sentencing. He makes no argument that the trial court improperly determined the factors under <u>State v. Wilkerson</u>, 905 S.W. 2d 933, 938 (Tenn. 1995), in concluding that he was "a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." Instead, he argues that the trial court's imposition of a consecutive term of imprisonment to a life sentence without the possibility of parole was "illogical." He reasons further that, under these circumstances, the aggregate sentence is not necessary to protect the public because he will never be released from prison. In response, the State contends, and we agree, that the trial court acted within its discretion in ordering partial consecutive sentencing.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115(a). The Tennessee Supreme Court has held, "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." <u>State v. Pollard</u>, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). Tenn. Code Ann. § 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." <u>Pollard</u>, 432 S.W.3d at 861. An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1); <u>see</u> <u>State v. Imfeld</u>, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Tenn. Code Ann. § 40-35-103(2); <u>see</u> <u>Imfeld</u>, 70 S.W.3d at 708. When imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." <u>Id.</u> (quoting <u>Wilkerson</u>, 905 S.W.2d at 938).

The Defendant does not provide a legal basis to contest the trial court's imposition of consecutive sentencing, and upon our review of the record, we find none. While we acknowledge the Defendant's argument concerning the practical effect of life imprisonment without the possibility of parole, this court has repeatedly rejected "<u>Wilkerson</u> challenges [in] a variety of sentences imposed consecutively to an extremely lengthy prison sentence--up to and including sentences of life in prison and life in prison without the possibility of parole." <u>State v. Andrew Mann</u>, No. E2010-00601-CCA-R3-

CD, 2012 WL 184157, at *18 (Tenn. Crim. App. Jan. 23, 2012) (citing series of cases in support of same); see also State v. Robinson, 930 S.W.2d 78, 85 (Tenn. Crim. App. 1995) (holding that "separate and distinct violations of the law receive separate and distinct punishments"). Finding no error in the order of partial consecutive sentencing, the Defendant is not entitled to relief.

Upon our review of the appellate record, we observe, as reflected in the chart of the Defendant's sentences, that there are no judgments reflecting that Counts 6, 13, and 15 were merged with Counts 5, 12, and 14, respectively. The trial court should, on remand, enter judgment forms reflecting the disposition of Counts 2, 3, and 4 in separate uniform judgment documents. See State v. Davidson, 509 S.W.3d 156, 217 (Tenn. 2016) (requiring a trial court to prepare a uniform judgment document for each count of the indictment). We also note that in Count 6, there is no judgment reflecting the reduced offense of aggravated burglary. See Tenn. Code Ann. §39-13-404(d) (prohibiting dual convictions for both especially aggravated burglary and especially aggravated robbery). Accordingly, we remand this matter for entry of judgments reflecting merger in Counts 6, 13, and 15.

## CONCLUSION

Based upon the above authority, reasoning, and analysis, we conclude that it was error to admit the Waffle House robbery from Georgia in the penalty phase of the Defendant's trial. I, as the author of the majority, would have further concluded that it was error to admit portions of the 911 tape in the State's case-in-chief. However, given the overwhelming evidence of the Defendant's guilt and the existence of two other aggravating circumstances, we conclude that such errors were harmless. We also conclude that the trial court properly imposed consecutive sentencing. The judgments of the trial court are affirmed; however, this case is remanded for entry of judgments reflecting merged offenses in Counts 6, 13, and 15.

_____
CAMILLE R. MCMULLEN, JUDGE

- 24 -